# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## GROUP MONTEGO Cases As Follows:

UNITED STATES OF AMERICA,

      Plaintiff,

v.

| | |
|---|---|
| 381.76 ACRES OF LAND, AND MONTEGO LAND CORP., *et al.* | 96-1813-CIV-MORENO/TURNOFF TRACT NO. 605-02 |
| 390.00 ACRES OF LAND, AND SIGMA LAND CORP., *et al.* | 99-0669-CIV-MORENO/TURNOFF TRACT NO. 604-04 |
| 10.00 ACRES OF LAND, AND JAIME GONZALEZ, *et al.* | 99-0672-CIV-MORENO/TURNOFF TRACT NO. 604-03 |
| 40.00 ACRES OF LAND, AND MONTEGO LAND CORP., *et al.* | 99-0674-CIV-MORENO/TURNOFF TRACT NO. 602-05 |
| 111.81 ACRES OF LAND, AND UNION FOUR CORP., *et al.* | 00-3983-CIV-MORENO/TURNOFF TRACT NO. 511-09 |

Defendants.

_____/

## REPORT OF LAND COMMISSIONERS

The Commission finds the fair market value of the lands taken in these proceedings to be as stated in the "Conclusion" of this report. The Conclusion also identifies the dates of the Declaration of Taking by the Plaintiff, as reflected in the Court files.

## APPEARANCES

Georgia Garthwaite, Esq. and John O. Holm, Esq., of the U.S. Department of Justice, Environmental and Natural Resources Division, appeared and represented the Plaintiff, the United States of America.

Samantha Tesser Haimo, Esq. and John Lukacs, Esq. represented the Defendants/Landowners, Jaime Gonzalez, Maria Elena Gonzalez, Montego Land Corporation, Sigma Land Corporation and Union Four Corporation.

## STATEMENT OF PROCEEDING AND EVIDENCE

These five consolidated cases were tried before the Land Commission on January 26, 27 and 28, 2010, at the United States District Courthouse, Southern District of Florida, in Miami, Florida.  The five tracts of land at issue in this proceeding are as follows:

| Five Consolidated Cases | | | | |
|---|---|---|---|---|
| Civil No. | Tract No. | Prior Owner | Date of Taking | Tract Size (Acres) |
| 99-0674 | 602-05 | Montego Land Corp. | March 9, 1999 | 40.00 |
| 96-1813 | 605-02 | Montego Land Corp. | March 2, 1999 | 381.76 |
| 99-0669 | 604-04 | Sigma Land Corp. | March 9, 1999 | 390.00 |
| 99-0672 | 604-03 | Jaime Gonzalez | April 9, 1999 | 10.00 |
| 00-3983 | 511-09 | Union Four Corp. | October 20, 2000 | 111.81 |

## I.   Witnesses

Jaime Gonzalez appeared on behalf of the defendant landowners.  He testified as the owner of the 10 acre parcel, Tract No. 604-03 ("Gonzalez 10 acre parcel"), as the President of Sigma Land Corporation and as the President of Montego Land Corporation.[1]  Gonzalez also testified as the agent for Union Four Corporation, which is the owner of the 111.81 acre parcel, Tract No. 511-09 ("Union Four 111.81 acre parcel").[2]

---

[1]    Sigma and Montego are owners of the 390 acre parcel, Tract No. 604-04 ("Sigma 381.76 acre parcel"), 40 acre parcel, Tract No. 602-05 ("Montego 40 acre parcel") and 381.76 acre parcel, Tract No. 605-02 ("Montego 381.76 acre parcel").

[2]    Gonzalez testified as to the fair market value of the subject parcels. He holds a real estate license obtained in 1981 and worked for various real estate companies, including, Century

John R. Underwood, MAI, and Robert A. Johnson, a National Park

Service hydrologist, testified on behalf of the United States.

## FACTS

**II.     The Defendants/Landowners' Testimony**

Jaime Gonzalez was born in Ubate, Colombia in 1935 and served as a pilot with

the Colombian Air force until his retirement from that service. He began a crop dusting

business after his retirement from the service which he ran for twenty-five years.

In or about 1973, Mr. Gonzalez immigrated to the United States[3] and began

purchasing property in the East Everglades region. In 1973, he purchased a 2 ½ acre

parcel located at 15700 209th Ave., in Miami-Dade County for approximately $10,000.

The property was located approximately five minutes from Krome Avenue. Years later,

he purchased and negotiated the purchases of the Gonzalez 10 acre parcel, the Montego

40 acre parcel, the Montego 381.76 acre parcel and the Sigma 390 acre parcel. He also

purchased and negotiated the sale of the Prairie Land parcel, for 262 acres, located just to

the east of Sigma 390 acre parcel. (Trial Tr. Vol. I, 17-19). Mr. Gonzalez negotiated a

sale of the property in 1991 for approximately $33,000. (Trial Tr. Vol. I, 22-24).

Gonzalez also negotiated two sales in the East Everglades to the South Florida

Water Management District. Specifically, he negotiated the sale of the Praire Land

parcel for 262 acres for $1,831,750 (approximately $7,000 an acre) and a portion of the

---

21 and Rieder Real Estate Co., a real estate company well known in the East Everglades area.
(Trial Tr. Vol. I, 19-20). Mr. Gonzalez currently buys and sells property in Clewiston, Florida,
for agricultural purposes, and also manages numerous sugarcane farms in Clewiston. (Trial Tr.
Vol. I, 20, 22). Since the 1980s, Gonzalez also has experience in managing multi-family
residential properties as well as owning rental properties. (Trial Tr. Vol. I, 20-22). The
testimony of an owner as to the value is to be weighed and considered as that of any other
witness expressing an opinion as to the fair market value at the time of the taking (Instruction 6
to Commissioners).

[3]     Gonzalez testified that his land in Colombia had been confiscated without compensation by
Colombian rebels.

original sale of the Sigma parcel, 203 acres, for $1,488,900 (approximately $7,334 an acre). (Trial Tr. Vol. I, 53; 92; Defendants' Ex. 17, 18).

Gonzalez testified that he had applied for rock-plowing permits to convert the Gonzalez 10 acre parcel, the Sigma 390 acre parcel and the Montego 381.76 parcel to agricultural use. [4] The only permit actually denied related to his 10 acre parcel. (Trial Tr. Vol. I, 37; Plaintiff's Ex. 74).

Gonzalez further testified that the 10 acre Gonzalez parcel, 390 acre Sigma parcel and 381.76 acre Montego parcel were all surrounded to the East, North and South by permitted farmland.[5] He also referred to the Everglades National Park Boundary Map demonstrating that the parcels were adjacent and proximate to agricultural areas (including areas to the west of SW 232 Ave) (Defendants' Ex. 28). Mr. Gonzalez also provided testimony supporting the fact that properties located to the west of 232nd Ave. were also engaged in farming. (Trial Tr. Vol. I, 49-50; 57).

Gonzalez acknowledged that he was unfamiliar with the specifics of County, State and Federal zoning and permitting requirements. However, he knew that the subject parcels were located in Management Areas based upon the hydrologic conditions of the subject parcels. (Trial Tr. Vol. I, 134-136). He disagreed with the general findings of fact that the subject parcels (except for the 111.81 Union Four parcel) were flooded

---

[4]     Gonzalez' applications for rock-plowing permits for the Sigma 390 acre parcel and the Montego 381.76 acre parcel were never denied by the U.S. Environmental Protection Agency ("EPA") but were merely forwarded to the EPA Region IV Office in Atlanta, Georgia, since there was a former EPA decision issued on June 15, 1988, relating to <u>portions</u> of the Sigma 390 acre parcel and the Montego 381.76 acre parcel (Plaintiff's Ex. 87).4 Mr. Gonzalez specifically testified that his permit to rockplow the Sigma 390 acre parcel was not completely denied (Trial Tr. Vol. 1, 59:8-21). As for the Gonzalez 10 acre parcel, Mr. Gonzalez testified that he never appealed the denial of his permit for the 10 acre parcel because when he received the denial, it was around the time that he knew that the property was going to be taken by the Government and he did not want to spend additional money when he knew his land was going to be taken (Trial Tr. Vol. 1, 41:14-42:2).
[5]     Defendants' Exhibit 29 demonstrates the location of the 10 acre Gonzalez parcel, 390 acre Sigma parcel and 381.76 acre Montego in relation to agricultural lands

4

between 3-6 months out of the year or even 0-3 months out of the year since the Sigma and Praire Land parcels located just to the east of the Sigma 390 acre parcel and Gonzalez 10 acre parcel, were fully farmed.[6]

Gonzalez testified at the time that he was applying for permits in the East Everglades that mitigation was not required.

Gonzalez contends that all the subject parcels, except the Union Four parcel, were physically capable of being farmed, were proximate and adjacent to established farming and were proximate and adjacent to permitted farming.  Based upon the foregoing, Mr. Gonzalez opined the following values for the subject parcels:

| Defendants' Fair Market Valuations | | | | |
|---|---|---|---|---|
| **Owner** | **Montego** | **Montego** | **Sigma** | **Gonzalez** | **Union Four** |
| Segment/Tract | 602.05 | 605.02 | 604.04 | 604.03 | 511.09 |
| Size (Acres) | 40 | 381.76 | 390 | 10 | 111.81 |
| Dates of Taking | Mar-99 | Mar-99 | Mar-99 | Feb-99 | Oct-00 |
| Value Conclusions Per Acre | $10,000 | $8,000 | $8,000 | $9,000 | $1,500[7] |
| **Value Conclusions** | **$400,000** | **$3,054,000** | **$3,120,000** | **$90,000** | **$168,000** |

While Gonzalez's contention may have some theoretical plausibility, we find the landowners' argument unpersuasive.

### III.   The Subject Parcels

#### A.   The 40 Acre Parcel, Tract 602-05

##### a.   Location and Physical Characteristics

Tract No. 602-05 is a 40 acre parcel located approximately 1.9 miles west of the

---

[6]      Gonzalez insisted that if the land was flooded for one day, he would not have been able to continue to the lease the parcels for agricultural purposes.  His testimony was similar with regard to the Montego 40 acre parcel and the 51.25 acres permitted from the Montego 381.76 acre parcel.  (Trial Tr. Vol. I, 134-136).

[7]      Gonzalez also argued that the value of the Union Four 111.81 acre parcel should include appreciation for time.  (Trial Tr. Vol. I, 100:10-13).

L31-N Canal (the Levee) on the north side of SW 200th Street (Defendants' Ex. 5, 11). The underlying zoning for the property is AU, Agricultural District, by Miami-Dade County and is located in Management Area 3C. According to Mr. Gonzalez, the property has never flooded. The entire 40 acres was in year-round agricultural production from 1988, the date it was purchased by Dendant, to 1999, the year it was taken by Plaintiff.

**b.      Purchase History**

The property was purchased in August, 1988. At the time of purchase, it contained an additional 381.76 acres, located in Sections 6 and 7, Township 57 South, Range 38 East, in Miami-Dade County (Tract No. 605-02).

**c.      Permitting History**

The entire 40 acres were in agricultural production since 1988. As such, the agricultural use is a legal use of the land. At the time of taking, the property was being leased and the farmers were growing plantains on the property. The highest and best use for the 40 acre parcel is for continued agricultural use.

**B.      The 381.76 Acre Parcel, No. 605-02**

**a.      Location and Physical Characteristics**

Tract No. 605-02, is a 381.76 acre parcel located along the west side of the L31-N Canal. It is bisected by SW 288th Street. There is a bridge at SW 288th Street that spans the L31-N Canal. The underlying zoning for the property is AU, Agricultural District, by Miami-Dade County. The property has access from SW 232nd Avenue (paved road), SW 235th Avenue (paved road) and SW 288th Street (farm road). (Defendants' Ex. 4, 10). The property abuts established farmland to the north, south and east. The 381.76 acre parcel is located in Management Area 3B. Again, Gonzalez testified that the

property never flooded and the soil type and hydrological conditions are suitable for agricultural production.

### b.    Purchase History

The property was purchased in August, 1988.  At the time of purchase, it contained an additional forty (40) acres, located in Section 6, Township 56 South, Range 38 East (Tract No. 602-05).

### c.    Permitting History

On September 28, 1984, the State of Florida Department of Environmental Regulation issued a five (5) year rock plowing permit to the former owner of the parcel. The permit also allowed for cultivating the entire 381.76 acre parcel for agricultural use and constructing agricultural access roads (Plaintiff's Ex. 92).

On the date of taking the property had permits for agricultural use for 51.25 acres (Defendants' Ex. 24, 26, 27) as well as water use permits for the entire 381.76 acres (Defendants' Ex. 21, 22).[8]

Gonzalez testified that it was financially feasible for the entire 381.76 acres to be farmed.  He stated that it costs approximately $500.00 an acre to rockplow.  He further contended that the Landowner had no mitigation requirements imposed relating to the 51.25 acres that were previously granted a permit.  (Trial Tr. Vol. I, 50-51; 90).

---

[8]    The United States argues that the Montego 381.76 acre parcel was denied a permit for agriculture on November 30, 1990, identifying Plaintiff's Ex. 87 in support thereof. Exhibit states that the Regulatory Division "can not [sic] accept or process [the] applications"and that they are being forwarded to the EPA Region IV Office in Atlanta, Georgia in light of a prior EPA 404(c) decision.  Said EPA 404(c) decision, dated June 15, 1988 (Plaintiff's Ex. 78), related to the proposed rock plowing of three separately-owned properties in the East Everglades, including portions of the Montego 381.76 acre parcel from a prior owner of the subject parcel, Senior Corporation (hereinafter, the "EPA Henry Rem decision").  The EPA Henry Rem decision affected only 162 acres of the Montego 381.76 acre parcel, which left 167.75 acres of the Montego 381.76 acre parcel without any denials from the EPA.  Accordingly, the 167.75 acres, in effect, still had approval for agricultural use from the State of Florida Department of Environmental Regulation according to the 1984 permit.  (Plaintiff's Ex. 92).  According to Gonzalez, Montego Land Corporation did not continue to pursue its permit application since, at that time, it knew that the property was going to be taken by the United States.  (Plaintiff's Ex. 87).

C.     The 390 Acre Parcel, Tract 604-04

a.     Location and Physical Characteristics

Tract No. 604-04, is a 390 acre parcel located at the intersection of SW 232nd Avenue (paved road) and SW 248th Street (farm road), Miami-Dade County, Florida. The underlying zoning for the property is AU, Agricultural District, by Miami-Dade County. The parcel consists of 80 acres located to the North of SW 248th Street and 310 acres that are located to the South of SW 248th Street (farm road). The 80 acre parcel is located in Management Area 3C and the 310 acre parcel is located in Management Area 3B (Defendants' Ex. 3 and 9). The 390 acres are adjacent to established farmland to the north, east and south. (Defendants' Exhibit 3, 29).

b.     Purchase History

The property was purchased in May, 1988. At the time of purchase, it contained an additional approximate 203 acres.

c.     Permitting History

Similar to the Montego 381.76 acre parcel, on September 28, 1984, the State of Florida Department of Environmental Regulation issued a five (5) year permit to the former owner of the parcel, expiring on October 1, 1989, to prepare the entire 390 acre parcel for agricultural use by rock plowing and constructing agricultural access roads. (Plaintiff's Ex. 92). Water use permits were issued for 310 acres of the Montego 381.76 acre parcel, or 79% of the property. (Defendants' Ex. 23). Similar to the Montego 381.76 acre parcel, the EPA Henry Rem decision affected 150 acres of the Sigma 390 acre parcel, which left 240 acres of the Sigma 390 acre parcel, without any type of EPA denial.

**D.**     **The 10 Acre Parcel, Tract 604-03**

    **a.**     **Location and Physical Characteristics**

Tract No. 604-03, is a 10 acre parcel that is rectangular in shape and abuts the 390 acre Sigma property, Tract No. 604-04 (Defendants' Ex. 3), on three sides. The property has frontage along SW 232nd Avenue (paved road) and SW 248th Street (farm road). (Defendants' Ex. 2 and 8). The underlying zoning for the property is AU, Agricultural District, by Miami-Dade County.

The property is located in Management area 3B. Farming was permitted directly adjacent to the 10 acre subject parcel. The adjacent parcel, on the east side of 232nd Avenue, had water use permits and permits for agricultural permits in place. (Defendants' Ex. 23, 24, 25).

According to Gonzalez, the property never flooded and had the identical soil and hydrological characteristics as the land to the east. The 10-acre parcel was adjacent and/or proximate to agriculture. (Defendants' Exhibit 3, 29).

    **b.**     **Purchase History**

The property was purchased on March 27, 1975 by Mr. and Mrs. Gonzalez.

**c.**     **Permitting History**

Gonzalez was denied a permit to rock plow the 10 acre parcel on February 5, 1990.

**E.**     **The 111.81 Acre Parcel, Tract 511-09**

    **a.**     **Location and Physical Characteristics**

Tract No. 511-09, is a 111.81 acre parcel located approximately one mile west of SW 237th Avenue, on the north side of SW 136th Street, known as Howard Drive. At this location, SW 136th Street is a farm road. (Defendants' Exhibits 6, 12). Paved, all-

weather roads are located 1.25 miles to the east (SW 136th Street & SW 237th Avenue). The underlying zoning for the property is AU, Agricultural District, by Miami-Dade County. The 111.81 acre parcel is located in Management Area 3C. The parcel had no permits issued for agricultural use and was not adjacent or proximate to any farming.

### b.      Purchase History

The property was purchased on February 10, 1988.

### Permitting History

The owner of the 111.81 parcel never applied for any agricultural permits for the property.

## IV.      FACTS REGARDING PERMITABILITY

The United States contends that there was no reasonable probability of the issuance of agricultural use and rock plowing permits for the subject parcels. Appraiser John Underwood testified that it was not reasonably probable that rock plowing permits would be issued for the subject properties' agricultural use as of the date of value. In arriving at his opinion, he stated that he considered past permitting activity. [9]

It is undisputed that Management Areas 1, 2, 3 and each of their respective subparts are all within the designated area of critical environmental concern. (Trial Tr. Vol. II, 135). The area of critical environmental concern is not limited to the areas in which the subject parcels are located. The easterly boundary of the area of critical environmental concern is the center-line of the L-31 Canal. The L-31 Canal lies to the east in close proximity to the Montego 381.76 acre parcel, the Sigma 390 acre parcel and

---

[9]      In 1984 the State of Florida Department of Environmental Regulation issued a permit authorizing agricultural use by rock plowing and constructing agricultural access roads for the entire Sigma 390 acre parcel and Montego 381.76 acre parcel. (Trial Tr. Vol. II, 131; Plaintiff's Ex. 92).

the Gonzalez 10 Acre parcel. The Montego 381.76 acre parcel and the Sigma 390 acre parcel are approximately ½ mile from the L-31 Canal to the west. Approximately 1/3 of the Montego 381.76 acre parcel actually abuts the L-31 Canal. According to Mr. Johnson, a hydrologist employed by the National Parks Service, properties located adjacent and/or in proximity to the L-31 Canal enjoy better hydrologic qualities. (Trial Tr. Vol. I, 178; Vol. II, 136; Trial Tr. Vol. III, 33-34). Management Area 3-B has a lesser hydroperiod than Management Area 3-C. (Trial Tr. Vol. III, 33). The Montego 40 acre parcel is located in Management Area 3-C, approximately 2 miles from the L-31 Canal and is used 100% for agricultural use. The closer the property to the levee, the better the physical attributes and the better the hydrologic conditions. (Tr. Vol. I, 178; Trial Tr. Vol. III, 33-34). It is undisputed that the Montego 381.76 acre parcel, the Sigma 390 acre parcel and the Gonzalez 10 acre parcel, are much closer to the L-31 canal than the Montego 40 acre parcel.

Between the Montego 381.76 acre parcel, the Sigma 390 acre parcel and the Gonzalez 10 acre parcel and, the L-31 canal, exist established farmland. (Trial Tr. Vol. II, 140; Defendants' Ex. 29).

The Montego 381.76 acre parcel, the Sigma 390 acre parcel and the Gonzalez 10 Acre parcel are adjacent and contiguous to S.W. 232nd Avenue, a paved road. Each of these parcels physically abut the west side of 232nd Avenue. The southerly 1/3 of the Montego parcel abuts the east side of S.W. 232nd Avenue and actually lies between the east side of S.W. 232nd Avenue and the L-31 Canal. S.W. 232nd Avenue is not a fictitious line of demarcation that makes the Montego, Sigma and Gonzalez parcels inferior to the properties across the street. (Trial Tr. Vol. II, 141-142). According to Mr. Underwood any properties that were not existing agricultural use on the east side of S.W. 232nd

11

Avenue would have to go through the same application process as the subject parcels. Mr. Underwood confirmed that if you are in the area of critical environmental concern you are subject to the same requirements. Furthermore, it is not uncommon for agricultural use permits to be subject to conditions. All permits, according to Mr. Underwood, are subject to conditions. (Trial Tr. Vol. III, 61).

In 1984, the State of Florida Department of Environmental Regulation issued a five (5) year permit allowing for rock plowing and cultivating the entire Montego 381.76 acre parcel. On the date of taking, the Montego 381.76 acre parcel had permits for 51.25 acres as well as water permits for the entire parcel. The same 1984 permit allowed for the agricultural use of the entire Sigma 390 acre parcel by rock plowing and constructing agricultural access roads. Water permits were issued for 310 acres or 79% of that parcel. The Gonzalez 10 acre parcel was denied a rock plowing permit in 1990 by the United States Army Corps of Engineers. This denial occurred after the 1989 Act of Congress which authorized the taking of properties in the East Everglades, including Mr. and Mrs. Gonzalez' 10 acre parcel.

The defendants contend that there was a greater probability of the issuance of permits. The Federal State and local agencies involved in the permitting process, had to agree to the issuance of permits. There was insufficient evidence presented to establish that each of these agencies would have agreed. Accordingly, our findings must remain based upon the property conditions as they existed as of the dates of taking.

## V.   **THE UNITED STATES' WITNESSES AND ASSERTIONS OF VALUE**

The United States called two witnesses testify as experts in their respective fields: Robert A. Johnson, a National Park Service hydrologist and the head of the South Florida Natural Resources Center at Everglades National Park; and John R. Underwood, MAI, a certified appraiser. [10]

Mr. Johnson was admitted as an expert witness in hydrology and historical water management with specialized knowledge of South Florida and the East Everglades (Trial Tr. vol. 1, 144:20-145:1). Johnson testified that rock plowing is considered discharge of fill on wetlands under § 4 04(c) of the Clean Water Act (Trial Tr. vol. 1, 152:2-10). Although the U.S. Environmental Protection Agency ("EPA") oversees the § 404 permitting process, oversight is generally transferred to the U.S. Army Corps of Engineers (Trial Tr. vol. 1, 152:2-6).   Johnson further testified that the East Everglades area, which encompasses the subject tracts, was set aside by Miami-Dade County in 1981 as an area of critical environmental concern, and divided into various "management areas" in order to protect the water quality and overall health, safety and welfare of current and future County residents (Trial Tr. vol. 1, 157:2-6, 170:2-25). Mr. Johnson indicated that those management zones are generally described.

---

[10] The United States identified two other witnesses, Michael Spinelli and Christopher Macey, in the pretrial stipulation, but did not call them to testify at trial regarding the depth and duration of flooding for each particular zone, and vary based on hydrology, vegetation, and soil (Trial Tr. vol. 1, 158:22-159:4). Mr. Johnson explained that under County definitions, "flooding" means any time water is within one foot of the ground surface (most hydrologic analyses consider flooding to mean when water goes above the ground surface; the County effectively uses an elevation control one foot lower than the ground surface). The County definition, used herein, encompasses not only standing water but also when the ground below that would be saturated and have the effects of flooding (Trial Tr. vol. 1, 159:5-21).

He further noted that Management Area 2A is permanently flooded, meaning water is typically standing on the ground or within one foot of the surface for at least nine months per year. To the south and east, the management zones have progressively shorter durations of flooding and smaller depths of flooding. Management Area 1 is at the other extreme, with high ground that has little flooding. Mr. Johnson testified that Management Area 1 is considered "sort of the developed footprint". Management Area 3 (subareas A, B and C) is a seasonally flooded area lying between Management Areas 1 and 2A (Trial Tr. vol. 1, 160:5-162:11). Mr. Johnson testified that all of the subject tracts were located in Management Area 3 under the Miami-Dade County Code, and explained the seasonal flooding that occurred on the subject tracts (Trial Tr. vol. 1, 169:23-172:7).

### John R. Underwood, MAI

John R. Underwood testified on behalf of the United States on the issue of parcel valuation. Mr. Underwood was first engaged by U.S. Department of Justice in 1997-1998 to do appraisal work in the East Everglades. Since 1997 and 1998, Underwood has performed at least 1000 appraisals in the East Everglades for the Government.[11]

### Pritchett, Ball & Wise, Inc.

At or about the time that Mr. Underwood was retained by the Government as an appraisal witness, the Justice Department had already engaged Pritchett Ball & Wise ("PBW"), an appraisal firm located in Atlanta, Georgia, to analyze sales in the East Everglades. (Trial Tr. Vol. II, 84). The sales to be analyzed came from the National Parks Service database. PBW analyzed these sales using a technique known as

---

[11]     Mr. Underwood has testified in approximately 30 trials before the Land Commission involving the Federal Government's taking of private property in the East Everglades.

14

regression analysis. (Trial Tr. Vol. II, 84). In the original request for proposal, there were nine areas that were identified by the Justice Department that were to be considered to see if these areas impacted sales positively or negatively. (Trial Tr. Vol. II, 84). One of those areas was the area of market conditions (time) adjustments, which involved determining whether sales should be adjusted for differences in the date of sale. PBW issued its first study in October 1997.

In its original 1997 study, PBW concluded, that for recreational land use properties, the appraiser may wish to consider adjusting sales upward for differences in the date of sale by between 5% and 7% a year. (Plaintiff's Ex. 72). In March 1999, PBW revised its original study. The March 1999 revision was referred to by PBW as the "First Revision, 3/99." (Defendants' Ex. 31, 32). By letter dated May 19, 1999, Mr. Wise of Pritchett, Ball & Wise, forwarded a copy of a PBW Study to Assistant U.S. Attorney Vollenweider wherein he thanked Mr. Vollenweider for his careful reading and review of the report. (Defendants' Ex. 33).

The Defendants-Landowners cross-examined Mr. Underwood at length regarding the Pritchett, Ball & Wise ("PB&W") market study, first published in 1997 and revised in 1999. As explained in the final version, (Pl.'s Ex. 73) PB&W conducted a market study identifying nine market elements that could potentially affect the market value of properties in the East Everglades Expansion Area following the announcement of the project in 1989 (Trial Tr. vol. 2, 84: 14-85:1). In the original study, PB&W found one element, market conditions, or time adjustment, affected wetlands at an appreciation rate of 5-7% per year (Pl.'s Ex. 72). PB&W then made the study available for peer review. Mr. Underwood, after running his own regression analysis, concluded that eight of the nine PB&W conclusions were supported by the study's market data (Trial Tr. vol. 2, 86:5-

9). However, Mr. Underwood's analysis did not support a time adjustment for wetlands (Trial Tr. vol. 2, 86: 5-9). Mr. Underwood notified the Department of Justice of his findings (Trial Tr. vol. 2, 87:3-6). The Department of Justice asked PB&W to re-analyze their data. After re-analysis, PB&W concluded that there was no definitive market evidence to support a time adjustment, either negative or positive (Pl.'s Ex. 73).

The evidence shows that the PBW "First Revision 3/99" contained the <u>same</u> market conditions (time) adjustments conclusion, *i.e.*, that for recreational land use properties, the appraiser may wish to consider adjusting sales upward for differences in the date of sale by between 5% and 7% a year. In its description of the "First Revision 3/99," PBW stated "In the process of redoing the study, we tested for coding errors and determined that although some errors exist, they did not have a statistically significant influence on our conclusions. We corrected any coding errors that were discovered, thereby increasing the reliability of the revised study." (Defendants' Ex. 31). By its "First Revision 3/99," PBW essentially ratified its earlier findings and conclusions.

According to Mr. Underwood, he was provided with a copy of the PBW 1997 original study which contained the excerpt which the Government offered as its Exhibit No. 72. Mr. Underwood did not remember ever receiving a copy of the PBW March 1999 "First Revision 3/99," which confirmed PBW's 1997 initial determination that a 5% to 7% upward adjustment for recreational land use properties was appropriate. Mr. Underwood, did remember receiving what he described as a "Second First Revision," in which PBW deviated from its earlier findings that sales should be adjusted upward 5% to 7% per year. That appears to have occurred in 2000, as evidenced by that certain letter dated March 22, 2000, from Mr. Wise of Pritchett, Ball & Wise, to Assistant U.S. Attorney Wright, Mr. Underwood and another appraiser named William Benson. In that

16

letter, Mr. Wise asked Messrs. Wright, Underwood and Benson to replace the appropriate pages in the PBW study reflecting PBW's new opinion that there was no evidence of a change in value over time in the East Everglades. (Defendants' Ex. 30). Mr. Underwood's appraisals of the subject properties followed a short time thereafter.

Underwood did not undertake to do any independent studies with respect to market appreciation. (Trial Tr. Vol. III, 22:7-15). PBW, in September 1997 and March 1999, twice concluded that a market appreciation adjustment for lands in the East Everglades is appropriate based upon its analysis of sales using regression analysis. Mr. Underwood, relatively new to the Federal Government, did not do a separate regression analysis on his own. According to Mr. Underwood he re-ran the PBW data and corresponded with Mr. Vollenweider regarding his disagreement with PBW's finding of market appreciation. (Trial Tr. Vol. III, 22:7-15). According to Mr. Underwood, that correspondence was sent to Mr. Vollenweider sometime in early 1998. (Trial Tr. Vol. III, 51-52). Mr. Underwood did not produce that correspondence in his work papers at his deposition because, according to him, most of his files were destroyed in the hurricanes and he does not have a copy of that letter anymore. If that is accurate, PBW's "First Revision 3/99," which it ratified its original finding of a 5% to 7% upward market conditions adjustment would have occurred after Mr. Underwood expressed his disagreement with PBW's findings.

It was not until March 2000, some two years and six months after its original study and one year after its "First Revision 3/99," that PBW changed its opinion of market appreciation and provided replacement pages for the PBW "First Revision 3/99."[12]

---

[12]     The second revision was also labeled "First Revision 3/99." Underwood referred to this second

17

We find the PBW study of 1997 and the 1999 revision that confirmed the 1997 findings to be persuasive as it relates to the appreciation of passive recreational property in the East Everglades. Accordingly, we find it reasonable and appropriate to apply a 5% per annum appreciation to those parcels deemed to qualify as passive recreational acreage. This 5% appreciation however would not apply to the two agricultural parcels at issue as herein previously identified.

### Sales Comparison Approach to Value

Underwood utilized the sales comparison approach for value in estimating the value of the subject parcels. For each parcel, he principally relied upon sales which he considered to be representative of each of the subject parcels. From certain of those sales Mr. Underwood identified a range of values and then concluded a price per acre somewhere within that estimated value range. Next, he multiplied his determined price per acre times the total number of acres for each parcel to arrive at his opinion of value for each parcel as of the date of value.

Although Mr. Underwood utilized the sales comparison approach for value, throughout his trial testimony, he testified that the East Everglades is not a rational market. (Trial Tr. Vol. II, 86:21-22; 93:8-12; 105:20-22; 149:3-10). Mr. Underwood specifically testified as follows: "One of the strange things about the East Everglades market area is this is not a rational market. It absolutely is not a rational market. You can cherry pick sales that will show increases. You can cherry pick sales that show there's decreases." (Trial Tr. Vol. II, 86:21-22). Further, he testified, "If you get into

revision as the "Second First Revision."

Management Area 1 where farming is permitted, I don't argue that there's increases there. I couldn't form a pattern of looking at locations in the wetland areas.  I mean, it's just not a rational market." (Trial Tr. Vol. II, 93:8-12).

a.    **The 40 Acre Montego Parcel, Tract 602-05**

| Landowner - Montego Land Corporation | |
|---|---|
| Segment/Tract | 602.05 |
| Location | SW 200 St |
| Size (Acres) | 40 |
| Road Frontage | Farm Road |
| Management Area | 3C |
| Distance from L31-N Canal | 1.9 miles |
| Adjacent to Farmed Lands | Yes |
| Percentage Permitted for Agricultural Use | 100% |
| Date of Taking | Mar-99 |

In valuing the Montego 40 acre parcel, Underwood presented the unadjusted prices for four sales ranging from a low of $1,407 per acre to a high of $5,500 per acre. These sales also ranged in size from 19 to 252 acres.  The Montego 40 acre parcel is 100% fully permitted. Of the four sales considered, Sale No. 3, the Prairie Land sale was the only sale that was 100% farmed. The Prairie Land sale is located MA-1 and MA-3B and sold for $4,306 per acre in 1990. This sale is located adjacent to the Sigma 390 acre parcel. Utilizing these four sales and this range of values, Mr. Underwood concluded that the value of the Montego 40 acre parcel should be $6,000 per acre.

Based upon the foregoing, the following represents the values for the subject parcel:

| Fair Market Value – Continued Agricultural Use | | |
|---|---|---|
| **Agricultural Land** | **Values per Acre** | **Value for 40 Acres** |
| | | |
| Underwood Conclusion for 40 Acre Montego | $6,000 | $240,000 |

### b. The 381.76 Acre Montego Parcel, No. 605-02

| Landowner Montego Land Corporation | |
|---|---|
| Segment/Tract | 605.02 |
| Location | SW 288 St |
| Size (Acres) | 381.76 |
| Road Frontage | Paved Road |
| Management Area | 3B |
| Distance from L31-N Canal | 201 Acres Abuts canal |
| Adjacent to Farmed Lands | Yes |
| Florida. DER Rockplow Approval (1984) | 100% |
| Water Use Permits | 100% |
| Acres Permitted | 51.25 Acres |
| Date of Taking | Mar-99 |

Underwood employed in his "first appraisal" the sales comparison approach, using three sales, the Montego sale, the Sigma sale and the Prairie Land Sale which he denominated Sales 1, 2 and 3. The established range of values for these three sales was as follows: Montego $1,328 per acre, Sigma $1,829 per acre and Prairie Land $4,302 per acre. The Prairie Land sale actually abuts the Sigma 390 acre parcel and is located between the Sigma 390 acre parcel and the L-31 Canal. (Trial Tr. Vol. II, 153).

Using these three sales, Mr. Underwood concluded that the Montego 381.76 acre parcel should be valued as a whole at $1,300 per acre. However on a "second appraisal", Mr. Underwood arrived at a value of $1,750 per acre.

The Commission finds that, with the exception of the 51.25 acres permitted for agriculture, the highest and best use of the rest of the Montego 381.76 acre parcel was

20

passive recreation and Mr. Underwood's $1,750 per acre value should be adjusted for market conditions consistent with the PBW original study of 1997 and "First Revision 3/99." The value of 330.5113 acres of the Montego 381.76 acre parcel, which are unpermitted, would be $2,625.00 per acre times 330.51 acres for a total value of $867,588.75. Thereafter, the 51.25 acres permitted for agricultural use should be valued at $6,000 per acre.

C.     **The 390 Acre Sigma Parcel, No. 604-04**

| Landowner - Sigma Land Corporation | |
|---|---|
| Segment/Tract | 604.04 |
| Location | SW 232 Ave/SW 248 St |
| Size (Acres) | 390 |
| Road Frontage | Paved Road |
| Management Area | 3B (79%)/3C (21%) |
| Distance from L31-N Canal | 0.4 mile |
| Adjacent to Farmed Lands | Yes |
| Florida. DER Rock plow Approval (1984) | 100% |
| Water Use Permits | 79% |
| Date of Taking | Mar-99 |

Mr. Underwood used the same five sales for the Sigma 390 acre parcel that he used for the Montego 381.76 acre parcel. He concluded $1,400 an acre was reasonable.

The commission finds the highest and best use of the Sigma 390 acre parcel was passive recreation and that Mr. Underwood's $1,400 per acre value should be adjusted for market conditions consistent with a 5% increase in appreciation in accordance with the PBW original study of 1997 and "First Revision 3/99." Accordingly, the value of the Sigma 390 acre parcel would be $2,100.00 per acre times 390 acres for a total value of $819,000.00.

---

[13]Since the Montego 381.76 acre parcel had permits for 51.25 acres, the parcel should be valued as such even if there is some confusion as to how many acres were actually farmed. (Defendants' Ex. 24, 26, 27).

c.    **The 10 Acre Gonzalez Parcel, No. 604-03**

The Gonzalez 10 acre parcel is located MA-3B, at located at the southwest corner of S.W. 248th Street and S.W. 232nd Avenue, a paved road.  In valuing the Gonzalez 10 acre parcel, Mr. Underwood considered ten sales ranging from a low of $500 per acre to a high of $3,000 per acre.  Mr. Underwood testified to and principally relied upon the following three sales in arriving at his opinion of value:  Sale No. 5 for $2,000 per acre, Sale No. 9 for $1,927 per acre and Sale No. 10, for $3,000 per acre.  Sale Nos. 5 and 9 are located in MA-3C and are not on a paved road.  Sale No. 10 is located in MA-1, and on the same paved road as the subject parcel.  Sale Nos. 5 and 9 contain approximately 5 acres and Sale No. 10 contains 25 acres.  According to Mr. Underwood the value of the subject parcel should be above Sales 5 and 9 but less than the value of Sale 10.  (Trial Tr. Vol. II, 188).  Mr. Underwood "did not do any adjustments to any sales".  (Trial Tr. Vol. II, 189).  According to Mr. Underwood, he "ranked them and analyzed them in relationship to the subject property."  (Trial Tr. Vol. II, 189).  Based upon his consideration of Sale Nos. 5, 9 and 10, Underwood concluded that the subject parcel should be valued at $2,200 per acre.

The Commission finds that the highest and best use of the Gonzalez 10 acre parcel was passive recreation and should be adjusted for market conditions consistent with a 5% increase as set forth in the PBW original study of 1997 and "First Revision 3/99," the value of Mr. Underwood's conclusion of $2,200 an acre, adjusted for time, would be $4,840.00 per acre times 10 acres for a total value of $48,400.00

## D. The 111.81 Acre Union Four Parcel, Tract 511-09

The Union Four parcel consists of 111.81 acres.  It was purchased on February 10, 1988.
The Commission finds that the highest and best use of the Union Four parcel was passive
recreation. Consequently Mr. Underwood's conclusion of value of $850 should be
adjusted for market conditions applying a 5% time adjustment, as indicated by the PBW
original study of 1997 and "First Revision 3/99," and would therefore value the parcel at
$1,275.00 an acre for a total valuation of $142,557.75.

## CONCLUSION

The Defendant landowners must establish by a preponderance of the evidence the
amount of just compensation to which they are entitled.  A preponderance of the evidence
is not necessarily established by calling the greater number of witnesses, it is established
by presenting evidence greater in weight and credibility.  The test is not which side brings
the greater number of witnesses or presents the greater quantity of evidence, but which
witnesses and which evidence appears to be more reasonable and otherwise trustworthy.
(Instruction 7 to Commissioners).

Based on the evidence presented, and applying the instructions of the Court, the
Commission finds that the Defendants/Landowners have proved by a preponderance of
the evidence that the "highest and best use" of the subject parcels is as follows:

| Civil No. | Tract No. | Prior Owner | Date of Taking | Tract Size-USE (Acres) |
|---|---|---|---|---|

| 99-0674 | 602-05 | Montego Land Corp. | March 9, 1999 | 40.00-Agricultural |
| 96-1813 | 605-02 | Montego Land Corp. | March 2, 1999 | 51.21-Agricultural **and** 330.51-Passive Recreation |
| 99-0669 | 604-04 | Sigma Land Corp. | March 9, 1999 | 390.00-Passive Recreation |
| 99-0672 | 604-03 | Jaime Gonzalez | April 9, 1999 | 10.00-Passive Recreation |
| 00-3983 | 511-09 | Union Four Corp. | October 20, 2000 | 111.81-Passive Recreation |

The Commissioners find that the Defendants-Landowners are entitled to the following compensation:

| Commission's Fair Market Value finding | | | | | |
|---|---|---|---|---|---|
| Owner | Montego | Montego | Sigma | Gonzalez | Union Four |
| Segment/Tract | 602.05 | 605.02 | 604.04 | 604.03 | 511.09 |
| Size (Acres) | 40 | 381.76 | 390 | 10 | 111.81 |
| Dates of Taking | Mar-99 | Mar-99 | Mar-99 | Apr-99 | Oct-00 |
| Value Conclusions Per Acre | **$6,000** | **51.25 acres @$6,000 & 330.51 acres @$2,625** | **$2,100** | **$4840** | **$1275** |
| **Value Conclusions** | **$240,000** | **$1,175,088.70** | **$819,000** | **$48,400** | **$142,557.75** |

Objections to this report may be filed within twenty (20) days after being served with notice of the filing of the report. If the parties fail to file objections, they may waive their right to appeal the findings.

24

DATED at Miami-Dade County, Florida, this 18th day of MARCH 2010.

_____
ROBERT A. LAZENBY

_____
RENALDY J. GUTIERREZ

_____
SETH V. FINKEL

25