UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

GROUP MONTEGO Cases As Follows:

UNITED STATES OF AMERICA,

    Plaintiff,

v.

| | |
|---|---|
| 381.76 ACRES OF LAND and MONTEGO LAND CORP., *et al.* , | Case No. 96-1813-CV-MORENO/TURNOFF TRACT NO. 605-02 |
| 390.00 ACRES OF LAND and SIGMA LAND CORP., *et al.*, | Case No. 99-0669-CV-MORENO/TURNOFF TRACT NO. 604-04 |
| 10.00 ACRES OF LAND and JAMIE GONZALEZ, *et al.*, | Case No. 99-0672-CV-MORENO/TURNOFF TRACT NO. 604-03 |
| 40.00 ACRES OF LAND and MONTEGO LAND CORP., *et al.*, | Case No. 99-0674-CV-MORENO/TURNOFF TRACT NO. 602-05 |
| 111.81 ACRES OF LAND and UNION FOUR CORP., *et al.*, | Case No. 00-3983-CV-MORENO/TURNOFF TRACT NO. 511-09 |

    Defendants.
_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the undersigned upon Plaintiff and Defendants' Objections to the Report of Land Commissioners **[DE 214, 216]**, respectively.[1] The Report of Land Commissioners

---

[1] For present purposes, the docket entry numbers referenced herein apply to Case No.: 96-CV-1813. The member cases contain different docket entry numbers for the filings. The docket entry numbers for the relevant documents in the individual cases are listed in the order that they appear in the caption of the instant Report as follows: (a) Report of Land Commissioners **[DE 211, 162, 263, 167, 133]**; (b) United States' Objections **[DE 214, 164, 266,169, 136]**; (c) Defendants' Response **[219, 167, 271, 172, 144]**; (d) United States' Reply **[DE 224, 172, 276, 177, 149]**; (e) Defendant's Objections **[DE 216, 166, 266, 171, 141]**; (f) United States' Response **[DE 223, 171, 275, 176, 148]**; and (g) Defendant's Reply **[DE 225 and 226, 174 and 177, 278 and 279, 178 and 181, 150 and 151]**.

(the "Report") was filed on March 19, 2010. **[DE 211]**. A hearing on these matters was held before the undersigned on May 25, 2010. Upon review of the Report **[DE 211]**, the written and oral arguments, the applicable law, the court file, and being otherwise duly advised in the premises, the undersigned makes the following findings.

**I. Standard of Review**

The standard of review in considering the Report is *de novo*. Rule 53(f)(3) and (4) of the Federal Rules of Civil Procedure dictate that "the court must decide *de novo* all objections to findings of fact" unless the parties stipulate otherwise, and "must decide *de novo* all objections to conclusions of law," respectively. Fed. R. Civ. P. 53(f)(3) and (4). In 2003, Rule 53 was amended to provide a standard of *de novo* review to the court's review of a special master's report. See Summer v. Howard Univ., 374 F.3d 1188, n.6 (D.C. Cir. 2004). Rule 53 further requires a *de novo* review by an Article III judge; however, any intervening report by a Magistrate Judge will not impair the ability of the District Court to conduct the required *de novo* review. See Report of the Civil Rules Advisory Committee (May 20, 2002) at 45.

**II. Background**

This case involves the valuation of five tracts of condemned property located in the East Everglades. Between March 1999 and October 2000, the Government acquired title to these properties, totaling 933.57 acres, pursuant to the 1988 Congressional Act authorizing the establishment of the Everglades National Park, the 1989 Congressional Act expanding the boundaries of the Park, and under the authority of the Land and Water Conservation Fund Act of 1965, as well as the Department of the Interior and Related Agencies Appropriations Act of 1995.

The District Court referred these five consolidated cases, known as Group Montego, to the

East Everglades National Park Expansion Land Commission on July 5, 2006. **[DE 111]**. The Group Montego cases were tried before the Land Commission on January 26-28, 2010. **[DE 211]**. The five tracts of land at issue are as follows:

| Civil No. | Tract No. | Prior Owner | Date of Taking | Tract Size |
|---|---|---|---|---|
| 96-1813 | 605-02 | Montego Land Corp. | March 2, 1999 | 381.76 acres |
| 99-0669 | 604-04 | Sigma Land Corp. | March 9, 1999 | 390.00 acres |
| 99-0672 | 604-03 | Jaime Gonzalez | April 9, 1999 | 10.00 acres |
| 99-0674 | 602-05 | Montego Land Corp. | March 9, 1999 | 40.00 acres |
| 00-3983 | 511-09 | Union Four Corp. | October 20, 2000 | 111.81 acres |

The Commission issued its findings of fair market value and just compensation for each of the five parcels (the "subject parcels"), and awarded Defendants-Landowners (the "Landowners") a total sum of $ 2,425,046.45.[2] *Id*. The United States filed its Objections to the Report on April 8, 2010, objecting, *inter alia*, to the Commission's conclusions of value for all tracts except Tract 602-05. **[DE 214]**. The Landowners filed their Objections to the Report on April 15, 2010, contesting, *inter alia*, the Commission's classifications of the parcels' highest and best uses. **[DE 216]**.

### III. The Witnesses

Three witnesses testified during the three-day trial. The Landowners presented one witness, Jaime Gonzalez ("Gonzalez"), and the Government called two witnesses: Robert Johnson ("Johnson") and John Underwood ("Underwood").

**A. Jaime Gonzalez**

Gonzalez appeared on behalf of the Landowners as owner of the 10-acre parcel (Tract No.

---

[2]Per parcel amounts, P.9, *infra*.

604-03), as President of Sigma Land Corp., owner of the 390-acre parcel (Tract No.604-04), as President of Montego Land Corp., owner of the 381.76 and 40-acre parcels (Tract Nos. 602-05 and 605-02), and as an agent of Union Four Corp., owner of the 111.81-parcel (Tract No. 511-09). **[DE 211]**. Gonzalez testified that all parcels, except the Union Four Corp. parcel, were physically capable of and adjacent to farming and gave an opinion of value for each tract based on agricultural use. Id. Ultimately, the Commission rejected Gonzalez's assertions as theoretically plausible, but unpersuasive. Id.

**B. Robert Johnson**

Johnson is a National Park Service hydrologist who heads the South Florida Natural Resources Center at the Everglades National Park. He was admitted as an expert witness in hydrology and historical water management with specialized knowledge of South Florida and the East Everglades. Id. Johnson testified that, in 1981, Miami-Dade County set aside the East Everglades area, which encompasses the subject parcels, as an area of critical environmental concern. The County further divided it into various "Management Areas." Id. Johnson explained the differences in the "Management Areas," noting that all of the subject tracts were located in "Management Area 3" (subareas B and C), a seasonally flooded area. Id. Johnson also defined "flooding," as when water is within one foot of ground surface, and "rock plowing," as the discharge of fill on wetlands. Id.

**C. John Underwood, MAI**

Underwood is an independent certified appraiser. He was admitted as an expert in the appraisal of real estate and testified on behalf of the Government on the issue of parcel valuation. Id. The Department of Justice first engaged Underwood in or about 1997 to perform appraisal work

in the East Everglades, and he has performed at least hundreds of appraisals since that time. Id. At trial, Underwood stated that his opinions conformed with the Uniform Standard of Professional Appraisal Practice and appraisal industry standards. Id. He explained his method of appraisal, opinion of value for each tract, and his opinion of the highest and best uses of each tract. Id. Underwood concluded that the highest and best use for each of the subject tracts was passive recreation, with the exception of certain acreage containing permits for agricultural use.[3] Id. Underwood concluded that the subject parcels were unlikely to obtain the necessary permits to convert the lands to agricultural use, and notwithstanding, mitigation costs would have made agricultural conversion not feasible. Id.

### IV. The Subject Parcels: Characteristics

All of the subject tracts are located in Management Area 3 and fall within the definition of "wetlands," as set forth in the Miami-Dade County Code. Id. In Management Area 3B and C, agriculture is a provisional use, provided that the land in question is adjacent or proximate to established farming, is physically capable of being farmed, and obtains all of the necessary permits. Id. In Area 3B (encompassing Tract Nos. 604-03, 605-02, and a portion of 604-04), the ground is flooded less than three months per year. Id. In Area 3C (encompassing Tract Nos. 602-05, 511-09, and a portion of 604-04), the ground is flooded three to six months per year. Id. Each of the subject tracts are subject to substantial federal and state water and wetland regulations. Id. A brief description of each individual tract follows:

**Tract 605-02** is a 381.76-acre tract owned by Montego Land Corp. Id. The parcel is located

---

[3] All 40 acres of Tract No. 602-05 and 51.25 acres of Tract No. 605-02 have a highest and best use of agricultural use.

in Management Area 3B and abuts established farmland to the north, south, and east. Id. Gonzalez testified that the property never flooded and that the soil type and hydrological conditions are suitable for agricultural production. Id. In 1984, the previous owner obtained a five-year rock plowing permit that allowed for cultivating the entire parcel for agricultural use. Id. As of the date of the taking, the property had agricultural-use permits for 51.25 acres and water-use permits for the entire parcel. Id.

In 1990, Montego applied for a permit for the remaining acreage. Id. The Government argues that the application was denied; however, the permit was merely forwarded to the EPA Regional Office in Atlanta, Georgia, in light of a prior decision affecting a portion of the property. Id. Accordingly, 167.75 acres were left without any denials from the EPA and, in effect, retained its approval for agricultural use pursuant to the 1984 permit. Id.

**Tract No. 604-04** is a 390-acre parcel owned by Sigma Land Corp. Id. The parcel is located in Management Areas 3B and 3C and is adjacent to established farmland to the north, east, and south. Id. The former owner of the parcel obtained a five-year rock plowing permit in 1984, and, water-use permits were issued for 310 acres of the parcel. Id. Similar to the Montego 381.76 parcel, a prior EPA decision affected a portion of the parcel, leaving 240 acres without any type of EPA denial. Id.

**Tract No. 604-03** is a 10-acre parcel owned by Gonzalez. Id. The parcel is located in Management Area 3B, is adjacent to permitted farmland, and abuts the 390-acre Sigma property (Tract No. 604-04) on three sides. Id. In 1990, Gonzalez was denied a permit to rock plow. Id.

**Tract No. 602-05** is a 40-acre parcel owned by Montego Land Corp. located in Management Area 3C. Id. The entire parcel has been in agricultural production since 1988, and, according to

Gonzalez, has never flooded. Id. The highest and best use for the parcel is for continued agricultural use. Id.

**Tract No. 511-09** is a 111.81-acre parcel owned by Union Four Corp. and located in Management Area 3C. Id. The parcel is not adjacent or proximate to any farming and has no agricultural-use permit applications nor approved permits. Id.

### V. Facts Regarding Permitting

The issue presented is whether there is a reasonable probability that rock plow permits for agricultural use would have been granted for the Montego 381.76-acre parcel, the Sigma 390-acre parcel and the Gonzalez 10-acre parcel, but for the takings. If so, the fair market value for each parcel would be based on the property value as if it had obtained the necessary permits for agricultural use. If not, the value of the parcels would be based on conditions at the time of the taking.

Gonzalez testified that the three above-mentioned parcels were surrounded to the east, north and south by permitted farmland, demonstrated that the parcels were adjacent and proximate to agricultural areas, and contended that the parcels were physically capable of being farmed. Id. He further testified that there was no discernible difference between the existing established farmlands adjacent and in proximity to the parcels. Id. Morever, Gonzalez noted that he had applied for rock plow permits to convert the parcels to agricultural use and that the only permit actually denied related to his 10-acre parcel, *supra*.

The Government's appraiser, Underwood, contended that there was no reasonable probability of the issuance of agricultural use and rock plowing permits for the subject parcels based on his personal experience doing appraisal work in the East Everglades and taking into account the parcels'

past permitting history. Id. He explained that the parcels are located in Management Area 3, where agriculture is permitted only as a *conditional* use. Therefore, in order to farm the parcels, the lands must not only be hydroponically capable of supporting agriculture, but they must also obtain the necessary federal, state, and county permits. Id. He further concluded that, even in the unlikely event that all of the necessary permits were granted, it would not have been financially feasible to convert the subject tracts' unaimed wetlands to agricultural use due to the mitigation costs related to the conversion of the unaimed wetlands. Id.

The Commission agreed with Underwood's conclusions that there was no reasonable probability that the government agencies would have issued permits for the parcels. Id. In so doing, the Commission found that the Landowners failed to present sufficient evidence to establish that each of the federal, state, and local agencies involved in the permitting process would have agreed to the issuance of permits. Id. Accordingly, the Commission based its findings upon the property conditions as they existed as of the dates of the takings. Id.

In their Objection, the Landowners argue that they had established by a preponderance of the evidence, that permits for agricultural use would have been granted for the subject parcels, and that the favorable location, physical characteristics and permitting history of the subject parcels support this finding. **[DE 216]**. The Landowners' argument rests on the grounds that Underwood's testimony on this issue was unsubstantiated and subjective because his opinion was gleaned entirely from a Dames and Moore report regarding the permitting history of the parcels. Id. The Landowners specifically claim that Underwood never had any direct discussions with the County regarding the issuance of permits, never independently researched past permitting activity, and never considered the issued permits in 1984. Id. Therefore, the Landowners contend that his opinion is unreliable.

Page 8 of 19

In its Response, the Government argues that, while the parcels may be physically capable of agricultural use, the Commission was correct in finding that the Landowners provided no grounds to assume that all of the required permits could have actually been obtained. **[DE 223]**. The Government further asserts that it was reasonable for Underwood to rely on the Dames and Moore report, because relying on a sub-consultant's report is a common, respected, and approved occurrence in appraisal practice and, "to hold otherwise would effectively demand an inconceivably broad area of expertise from any appraiser." Id.

This Court agrees with the Government and the Commission on this issue. The fact that the three above-mentioned parcels are adjacent and proximate to established and permitted farming is not, without more, determinative. The Landowners presented insufficient evidence that permits would likely be issued. This is especially true in light of the fact that all of the subject parcels are within the land area for which Miami-Dade County has enacted significant zoning and land-use restrictions. These restrictions substantially limit the uses that could be made of the tracts at issue. Furthermore, the parcels are subject to substantial federal and state water and wetland regulations, further limiting the potential uses of the land tracts.

Moreover, the fact that Underwood heavily relied on the Dames and Moore Report to arrive at his conclusions does not undermine his opinion in any way, particularly because the Report's accuracy has not been challenged. Therefore, it was reasonable for Underwood to rely on it. Accordingly, this Court finds that the Commission's decision to base valuations on the property conditions as they existed at the time of the takings was appropriate, and **RESPECTFULLY RECOMMENDS** that the Landowner's Objections as to this issue be **DENIED**. **[DE 216]**.

## VI. Assertions of Value

It is the Commission's task to determine the value of the lands as of the date of taking. The Government, the Landowners, and the Commission ascribed a price-per-acre and total valuation to each tract, as follows:

| Tract No. | Prior Owner | Tract Size | United States' Valuation | Landowners' Valuation | Commission's Valuation |
|---|---|---|---|---|---|
| 605-02 | Montego Corp. | 381.76 | $ 1750/acre | $ 8000/acre | 51.25 acres @ $ 6000/acre; 330.51 acres @ $ 2625/acre |
|  |  |  | $ 670,000 total | $ 3,054,080 total | $1,175,088.77 total |
| 604-04 | Sigma Corp. | 390 | $ 1400/acre | $ 8000/acre | $ 2100/acre |
|  |  |  | $ 546,000 total | $ 3,120,000 total | $ 819,000 total |
| 604-03 | Jaime Gonzalez | 10 | $ 2000/acre | $ 9000/acre | $ 4840/acre |
|  |  |  | $ 22,000 total | $ 90,000 total | $ 48,400 total |
| 602-05 | Montego Corp. | 40 | $ 6000/acre | $ 10,000/acre | $ 6000/acre |
|  |  |  | $ 240,000 total | $ 400,000 total | $ 240,000 total |
| 511-09 | Union Four Corp. | 111.81 | $ 850/acre | $ 1500/acre | $ 1275/acre |
|  |  |  | $ 95,038.50 total | $ 167,715 total | $ 142,557.75 total |

**A. Landowners' Valuation**

Gonzalez offered the Landowners' assertions of value based on his ownership interest in Tract No. 604-03, his involvement in the prior purchases of the remaining parcels, his knowledge of the use and history of the parcels, and his knowledge of other lands in the vicinity of the subject parcels. **[DE 211]**. Gonzalez's valuation was based on the value of the land assuming permits had been issued for agricultural use. Id. The Commission found Gonzalez's assertions of value to be unpersuasive, and this Court agrees.

## B. United States' Valuation

### 1. Method and Conclusions

The Government offered Underwood as its valuation witness in the proceedings. Id. Underwood utilized a qualitative sales comparison approach to estimate the value of the subject parcels. Id. For each parcel, he relied upon several representative sales, identified a range of values, concluded a price-per-acre within that estimated value range, and multiplied the price per acre times the total number of acres for each parcel. Id. Underwood testified that the East Everglades is not a rational market, has no set patterns, and gave his opinions of value for each tract as follows:

**Tract No. 605-02**: In valuing the Montego 381.76-acre parcel, Underwood presented prices for three comparable sales ranging from $ 1328 to $ 4302 per acre, each with various portions approved for agricultural use. Underwood initially concluded that the parcel should be valued, as a whole, at $ 1300 per acre. Id. However, he appraised the parcel a second time after noting that the tract is located on a paved road, is close to a bridge, and just over 10% of the tract was permitted for agricultural use. Recognizing and taking these factors into account, Underwood changed his methodology from a quantitative approach to a qualitative one, and arrived at a value of $ 1750 per acre. Id. Underwood continued to utilize this approach to appraise the remaining parcels.

**Tract No. 604-04**: Using the same sales (as for the Montego 381.76-acre parcel) for this mixed-use Sigma 390-acre parcel, Underwood concluded that $ 1400 per acre was reasonable. Id.

**Tract No. 604-03**: In valuing the Gonzalez 10-acre parcel, Underwood primarily relied on three comparable sales that were priced at $ 1927, $ 2000, and $ 3000. Id. Underwood testified that the value of the subject parcel should fall within that range, and concluded that the subject parcel is valued at $ 2200 per acre. Id.

**Tract No. 602-05**: In valuing the Montego 40-acre parcel on which farming is fully permitted, Underwood presented four sales ranging from $ 1407 per acre to $ 5500 per acre, with only one sale that was 100% farmed, which sold for $ 4306 per acre in 1990. Id. Utilizing this range of values, Underwood concluded that the value of this parcel was $ 6000 per acre. Id.

**Tract No. 511-09**: Underwood presented six comparable sales for this non-agricultural 111.81-acre property located in Management Area 3C. Id. Of these sales, he opined that the subject parcel falls below the highest sale ($ 2083/acre), which is partially located in Management Area 1, but higher than two similar properties which sold at $ 700 and $ 530 per acre, both of which are located in Management Area 3C. Id. Based on these factors, Underwood concluded that the subject parcel had a value of $ 850 per acre. Id.

**2. The Objections**

The Landowners argue that Underwood's conclusions are not credible because his methodology is too subjective and "nothing more than a guestimate of value." **[DE 216]**. The Landowners claim that a quantitative, factually-based approach is more appropriate than allowing Underwood to "cherry pick" sales to show increases and decreases and placing the subject parcel somewhere within that range. Id. The Landowners further assert that, for Underwood's methodology to be reliable, it would be necessary to have comparable sales that are superior as well as inferior so that the subject parcel can be ascribed a proper value. Id. For example, in valuing the Montego 40-acre parcel, Underwood failed to include any properties he believed were superior to the subject parcel and concluded a value *outside* the range of the comparable sales he presented. Id. Furthermore, the Landowners allege that the subject parcels were frequently superior to the comparable sales selected and imply that Underwood intentionally selected low sales. Id.

Accordingly, the Landowners claim that Underwood's opinion was conclusory, unsupported, and unreliable and cannot be relied upon as a basis in determining just compensation. Id.

The Government, on the other hand, responds as follows: First, Underwood was accepted as an expert witness and has extensive experience appraising real estate in South Florida, in general, and in the vicinity of the East Everglades, in particular. **[DE 223]**. Second, his decision to make qualitative rather than quantitative adjustments to his identified comparable sales is commonly accepted in appraisal practice. Id. Third, using a qualitative approach is reasonable in light of the multiple factors involved in each of the sales and the complex market in which the subject tracts are located. Id. Further, Underwood testified that he initially attempted to use a quantitative approach to appraise one of the subject tracts (605-02), but found that method to be problematic. Id. Accordingly, the Government contends that Underwood's valuations were reasonable. Id. The undersigned agrees.

While Underwood's methodology is not without flaws, it appears to this Court that it is the superior approach, especially considering the irrationality of the East Everglades market and the lack of sales comparable for the parcels at issue. There is no evidence that Underwood's opinions were anything less than honest attempts to determine the value of peculiar properties in a peculiar market while taking complex factors into account.

**C. The Commission's Valuation**

As noted *supra*, upon thorough review, the Commission accepted Underwood's valuation. However, upward adjustments were made as to the wetland tracts (Tract Nos. 605-02[4], 604-04, 604-

---

[4]The Commission did not adjust the value of the 51.25 acres permitted for agriculture.

03, and 511-09)[5] by a time adjustment of 5%. **[DE 211].** The Commission imposed its time adjustments based on a report known as the Pritchett, Ball & Wise ("PBW") study. Id.

### 1. The PBW Report

In 1997, the Department of Justice employed PBW to perform a statistical analysis to determine what impact various land characteristics may have on the market value of the lands in the East Everglades. Id. The initial study concluded, *inter alia*, that when dealing with properties categorized as "passive recreational" acreage in the East Everglades, the appraiser may consider reasonably adjusting sales upward between 5-7% per year. Id. In 1999, PBW re-analyzed its findings, made a few changes unrelated to the time adjustment, and issued a "First Revision." Id. Thereafter, the study was put out for peer review. Underwood then contacted PBW and questioned the legitimacy of the conclusion regarding the appreciation of value of the wetlands. Id. In 2000, PBW re-analyzed its data and concluded that there was, in fact, no definitive market support for the time adjustment, and issued another revision stating this conclusion (the "Second First Revision"). Id.

The Commission found PBW's initial study and its First Revision to be persuasive as to the appreciation of passive recreational property in the East Everglades, even though the Landowners did not present any market evidence to support the time adjustment and Underwood specifically rejected it in his testimony. Id. Accordingly, the Commission found it reasonable and appropriate to apply a 5% per annum appreciation to those parcels deemed to qualify as passive recreational acreage for two reasons. Id. First, Underwood did not undertake to do any independent studies with

---

[5]For these parcels, the Commission agreed with Underwood's conclusions that the highest and best use was passive recreation and modified his appraised values to adjust for market conditions consistent with a 5% increase as set forth in the original study and First Revision.

respect to market appreciation and merely re-ran PBW's data. Id. Second, in its First Revision, PBW used the same data and market conditions and came to the same conclusions regarding time adjustments. Id. Therefore, the Commission concluded that the First Revision "essentially ratified" PBW's earlier findings and conclusions, and the Commission disregarded PBW's "Second First Revision." Id.

### 2. The Objections

The Government objects to the Commission's utilization of a 5% appreciation of value, alleging, *inter alia*, that the time adjustment was without factual support, was contradicted, and violated the Rules of Evidence. **[DE 214]**. The Government specifically argues that the Commission's sole accepted valuation expert, Underwood, as well as the authors of the PBW study, rejected the notion of any appreciation over time for wetland tracts in the East Everglades. Id. In its "Second First Revision," PBW stated, "[o]ur more detailed research indicates that there is no reliable evidence that there has been a change in value over time." Id. The Government further asserts that the Commission had previously ruled that the PBW report was hearsay based on viewing the summary page, yet ultimately relied on it as actual evidence. Id. Moreover, when offered a complete copy of the "Second First Revision," the Commission declined to view or consider the report. Id.

In response, the Landowners argue that it was entirely appropriate for the Commission to utilize the upward adjustment because the Government had initially offered the original study into evidence and failed to object to the admissibility of the "First Revision," thereby waiving any objections.[6] **[DE 219]**.

---

[6]The Court notes that the Government contends that it introduced only a summary page into evidence, and solely for the Commission's *consideration*, not *use*. **[DE 224]**.

### 3. The Court's Findings

The Court finds that the Commission's utilization of a 5% upward adjustment for the parcels deemed to be passive recreation is contrary to the evidence presented at trial by Underwood and is without factual support. There is no evidentiary support permitting a higher compensation than found by Underwood, especially in light of the fact that even the authors of the PBW study ultimately rejected the time adjustment. Further, although it was the Government that initially brought the PBW report to the Commission's attention, this factor is not determinative. The Court finds that the Commission erred in applying the upward adjustment. The upward adjustment should be stricken from the findings, and just compensation should be awarded in accordance with Underwood's valuation conclusions. Accordingly, the undersigned **RESPECTFULLY RECOMMENDS** that the United States' Objections as to this issue be **GRANTED**. **[DE 214]**.

### VI. Other Objections to the Report of Land Commissioners

### A. The Summation Approach to Tract No. 605-02

The Government claims that the Commission legally erred in using a summation approach to value Tract No. 605-02 (96-1813), which resulted in double-counting, making the sum of the parts greater than the whole. **[DE 214]**. The 381.76-acre parcel contains 51.25 acres with a highest and best use of agriculturally permitted land with the remaining acreage categorized as passive recreation. **[DE 211]**. The Government specifically asserts that the Commission employed a summation approach by identifying and valuing the agricultural and non-agricultural portions of Tract No. 605-02 separately, then adding them together, which is prohibited by this Court's instructions, case law, and basic appraisal methodology. **[DE 214]**. The Commissioners' Instruction 16 states that "the different uses [of a parcel] may not be valued independently and added together

to derive a value for the whole property," even if the various parts of the single property have different highest and best uses. Comm. Instr. 16 (citing United States v. 320.00 Acres of Land, 605 F.2d 762, 817 n.124 (5th Cir. 1979).

In using this approach, the Government argues that the Commission effectively double-counted the value contributed by the agricultural lands by taking Underwood's appraised value, which he determined by comparing sales of properties with varying mixes of permitted agricultural and non-agricultural use, and ignoring the fact that a buyer would pay less per acre for a tract riddled with wetlands than for a tract that is entirely agricultural. **[DE 214]**. Because the presence of agricultural land contributed to Underwood's conclusion of $ 1750 per acre, the Commission then double-counted the contributory value of agricultural land by adding a bonus value to the agricultural acreage. Id.

The Court agrees. The Commission's utilization of a summation approach not only violated the applicable instructions, but also resulted in double-counting and over-valuation. Accordingly, the undersigned **RESPECTFULLY RECOMMENDS** that the United States' Objection in regard to this issue be **GRANTED**. Id.  The Commission's valuation for Tract No. 605-02 should be modified in accordance with the value attributed to the whole tract by Underwood.

**B. Whether Tract No. 605-02 contained 51.25 or 43 acres of permitted agricultural land**

The initial rock plow permit for Tract No. 605-02 applied only to 51.25 acres of the 381.76-acre tract. However, the Government contends that the U.S. Army Corps of Engineers had reduced the permitted acreage to 43 acres and that this Court should modify the value of the tract in light of the agricultural permitted acreage. **[DE 214]**. The Landowners deny that the permitted acreage was reduced and claim that all 51.25 acres had permits for agricultural use and were actually farmed. **[DE**

**219]**. The Commission held that, while there may be some confusion as to how many acres were actually farmed, since the parcel had permits for 51.25 acres, the parcel should be valued as such. **[DE 211]**.

This Court agrees with the Commission. The relevant evidence supports the fact that agriculture was permitted on all 51.25 acres. Accordingly, this Court **RESPECTFULLY RECOMMENDS** that the Commission's findings on this issue be upheld, and that the United States' Objection in regard to this issue be **DENIED**. **[DE 216]**.

### C. Whether Underwood ran his own, independent analysis with respect to market appreciation

The Landowners claim that the Report's statement, "Mr. Underwood, after running his own regression analysis, concluded . . ." **[DE 211]**, should be stricken because it is inconsistent with the record. **[DE 216]**. The Landowners assert that Underwood testified that he did not perform a separate analysis with respect to market appreciation, and merely re-ran PBW's own data. Id. However, the Government submits that the statement is accurate contextually, because while Underwood never performed an independent or separate study, he used PBW's database and PBW's information, re-ran it, and came to his own conclusions. **[DE 223]**.

This Court is not persuaded by the Landowners' position. Even if the Court were to modify the Report to reflect that Underwood reran PBW's data, all of the findings and conclusions contained therein would remain unchanged. Furthermore, this Court is not convinced that there is a discernible difference between the statement in the Report and Underwood's actions. Accordingly, it is **RESPECTFULLY RECOMMENDED** that this Objection be **DENIED**. **[DE 216]**.

### III.  Conclusion

Consistent with the foregoing, it is hereby **RESPECTFULLY RECOMMENDED** that United States' Objection **[DE 214]** and Defendants' Objections **[DE 216]** be **GRANTED IN PART** and **DENIED IN PART**, as follows:

(1) The Report of Land Commission filed on March 19, 2010, is hereby modified as to Tract Nos. 511-09, 604-03, 604-04, 605-02, and the amount awarded to Defendants should be reduced to comply with the findings of John Underwood, as supported by the uncontroverted evidence presented at trial; and

(2) Just compensation is recommended as follows: (a) As to Tract No. 511-09, the sum of $ 850 per acre; (b) As to Tract No. 604-04, the sum of $ 1400 per acre; (c) As to Tract No. 604-03, the sum of $ 2200 per acre; (d) As to Tract No. 605-02, the sum of $ 1750 per acre; and (e) As to Tract No. 602-05, the sum of $ 6000 per acre.

Pursuant to S.D. Fla. Magistrate Rule 4(b), the parties may serve and file written objections with the Honorable Federico A. Moreno, Chief United States District Judge for the Southern District of Florida, within fourteen (14) days of being served with a copy of this Report and Recommendation.  Failure to file timely objections shall bar the parties from attacking on appeal any factual findings contained herein.  RTC v. Hallmark Builders, Inc., 996 F. 2d 1144 (11th Cir. 1993); LoConte v. Dugger, 847 F. 2d 745 (11th Cir. 1988).

**RESPECTFULLY RECOMMENDED** in Chambers at Miami, Florida, this 3rd day of August 2010.

_____
**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc:  Hon. Federico A. Moreno
       Counsel of Record